**Albert L. ANDERSON and Kenneth Raines**

v.

**HAVERFORD COLLEGE.**

Civ. A. No. 93–6960.

United States District Court, E.D. Pennsylvania.

Nov. 22, 1994.

Steven Ludwig, Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA, for Albert L. Anderson.

Louis Rosner, Philadelphia, PA, for Kenneth Raines.

Alan D. Berkowitz, Carol B. Trask, Dechert Price & Rhoads, Philadelphia, PA, for defendant.

## MEMORANDUM

JOYNER, District Judge.

Before this Court is Defendant Haverford College's Motion for Summary Judgment against Plaintiffs Albert Anderson and Kenneth Raines. This litigation alleges that the College violated the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1981 & Supp. 1994), 42 U.S.C. § 1981 (1994) (Title VII); and the Pennsylvania Human Relations Act, 43 Pa.Stat.Ann. § 955(d) (Supp.1992) (PHRA). The following facts are undisputed unless otherwise noted.

### FACTUAL BACKGROUND

Anderson was hired by the College in 1978 to be its Maintenance Manager. This position required Anderson to direct the overall operations of the Maintenance Department and supervise approximately 20–25 Maintenance employees.

Raines was hired by the College in 1979 as a Maintenance Mechanic II and promoted five years later to Building Trades Lead Man. In that position, he reported directly to Anderson and supervised a crew of approximately seven carpenters and painters.

Until the termination of their employment by the College, both Anderson and Raines received good performance evaluations and feedback. However, in September, 1992, a carpenter in Maintenance named John Cros-son informed Norman Ricker, Director of Physical Plant, that Anderson and Raines ran Maintenance "for their own personal benefit."[1]

Crosson reported that for two years he had been accumulating evidence of improprieties, including taking photographs when he could. The incidents he reported included Anderson using two College employees on College time to paint shutters with College paint for Anderson's home, Anderson taking materials for use at a restaurant he owned and using College employees on College time to build furnishings for the restaurant, including countertops, base cabinets, a bulletin board and a door. Crosson alleged that at least some of the furnishings were made with at least some College-owned materials. Crosson reported that Raines had instructed the College employees to do the work on College time.

Upon receipt of these allegations and the corroborating photographs, the College immediately undertook an extensive investigation. The College's Investigation Summary concluded that:

> nearly all of John Crossan's original allegations were also reported to differing degrees by the other interviewees, except [Mary] Biggs [another Maintenance employee] and Anderson. Even Ken Raines admitted to some wrong-doing on his part and verified that work was done on paid College time on projects for Anderson, as well as verifying that employees' time sheets were signed by him with hours falsely attributed to other buildings.

The report also stated that Anderson had hired College employees to do work at his restaurant and paid them only minimal wages. Anderson allegedly believed the substandard wages were fair "because so much of their work was done on College time." The College considered this a "major abuse" of Anderson's authority because it believed that Anderson used his position of authority to take advantage of his subordinates.

The report stated that investigators were unable to verify whether Anderson used Col-

---

1. Crosson also reported that another worker, Trevor Cornwall, had made a set of speaker boxes on College time. The record does not reveal whether Cornwall was investigated or discharged by the College, nor whether he is a member of a protected class.

lege materials for his personal projects, but determined that many thousands of dollars of College employee time had been misappropriated by Anderson and Raines.

Copies of all materials produced by the investigation were forwarded to G. Richard Wynn, Vice President for Finance and Administration, and to Tom Kessinger, President of the College. Wynn recommended to President Kessinger that Anderson and Raines be terminated, and he accepted this recommendation. Anderson's termination was effective immediately and Raines's was effective at the end of the calendar year. The reason the College gave to support the terminations was abuse of College time and materials.

Anderson and Raines deny that the College terminated them on that basis. Rather, they assert that the College fired them on account of their race (both men are African American) and Anderson's national origin (Jamaican). Both admit that they have no evidence of race discrimination by the decision-makers or anyone else in College administration. However, they argue that the practice of doing personal work on College time was well established and accepted and that standards were unequally applied to them as a pretext to discharge them on the basis of their race and Anderson's national origin.

### SUMMARY JUDGMENT STANDARD

■ In considering a motion for summary judgment, a court must consider whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court must determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ In making this determination, all of the facts must be viewed in the light most favorable to the non-moving party and all reasonable inferences must be drawn in favor of the non-moving party. *Id.* at 256, 106 S.Ct. at 2514. Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the non-moving party must establish the existence of each element of its case. *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir.1990), *cert. denied*, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)).

### PRIMA FACIE CASE

■ Plaintiffs' claims arise under three separate causes of action: Title VII, 42 U.S.C. § 1981, and the PHRA. However, the legal elements of each of these causes of action are the same. *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 469 n. 10 (3d Cir.) (legal elements of Title VII and PHRA are identical), *cert. denied*, —— U.S. ——, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993); *O'Brien v. City of Philadelphia*, 837 F.Supp. 692, 699 (E.D.Pa.1993) (legal elements of Title VII and § 1981 are identical). For ease of discussion, we will do as the parties did and analyze Plaintiffs' claims under Title VII law and caselaw. Title VII's § 2000e-2(a)(1) states:

It shall be an unlawful employment practice for an employer—to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

■ A plaintiff can show a Title VII violation under either a disparate impact or disparate treatment theory. *EEOC v. Metal Serv. Co.*, 892 F.2d 341, 347 (3d Cir.1990). Plaintiffs here make a disparate treatment argument. They can succeed on this theory if they can prove, by a preponderance of the evidence, a prima facie case of discrimination. *Id.* Once this is done, the burden of production switches to the defendant to assert legitimate, nondiscriminatory reasons for the allegedly discriminatory actions. *Id.* Upon that showing, the burden of production switches back to the plaintiff to rebut, by a

preponderance of the evidence, the defendant's reasons. *Id.* This can be done either by showing that each reason is a recent fabrication or that discrimination is more likely than not a motivating or determinative cause for the actions. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973); *Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 637–38 (3d Cir.1993).

To make a prima facie case here, Plaintiffs must show that:

1) they are members of a protected class

2) they were qualified for their positions

3) despite these qualifications, they were terminated from the positions

4) they were replaced by someone not in a protected class *or* someone in a non-protected class, otherwise similarly situated, was treated more favorably.

*See McDonnell Douglas,* 411 U.S. at 802 & n. 13, 93 S.Ct. at 1824 & n. 13. The prima facie case is not intended to be difficult to show or rigidly applied. *Metal Serv.,* 892 F.2d at 347. Nonetheless, the College argues that Plaintiffs have not met the prima facie case on the last three elements.[2]

■ The College asserts that Plaintiffs were not qualified for their positions because, according to the College, both misappropriated thousands of dollars of College time. Therefore, the College asserts, Plaintiffs cannot show either the second or third prongs of the prima facie test. Plaintiffs argue that they were qualified and were terminated despite those qualifications. They support this by showing that they were continuously employed by the College for more than a decade each and received good reviews and salary increases the whole time. This is sufficient to show qualification. *Jalil v. Avdel Corp.,* 873 F.2d 701, 707 (3d Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990); *Weldon v. Kraft,* 896 F.2d 793, 798–99 (3d Cir.1990). Therefore, Plaintiffs have made the requisite showings on the first three points of the prima facie test.

The College also maintains, however, that Plaintiffs were not replaced by members of a non-protected class and cannot show that non-protected class members were treated more favorably than them. Raines was permanently replaced by a person in the same protected class as him. Therefore, he clearly has not made out a prima facie case using this test. Anderson's temporary replacement was a member of a different protected class,[3] but his permanent replacement is not in a protected class. Because his permanent replacement is not in a protected class, it is less certain that he has not made out a prima facie case.

Accordingly, we look to see whether similarly situated members of a non-protected class were treated more favorably than Anderson and Raines were. Anderson and Raines allege that Ricker is not a member of a protected class and that he was treated better by the College in a number of ways, despite being accused of the same type of wrongdoing.

■ In order to make this showing, each Plaintiff must establish "that the other employee's acts were of 'comparable seriousness' to his own infraction." *Lanear v. Safeway Grocery,* 843 F.2d 298, 301 (8th Cir. 1988) (citing *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825). They must show that they and Ricker "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir.1992).

First, they argue that when Raines was initially questioned by the College about Crosson's allegations, Raines stated that Ricker had full knowledge of their activities and had misused College funds himself. Plaintiffs' second argument is that when Ricker was questioned, it was by the Director of Security personally, and that Ricker was told the nature of the charges against him. Moreover, the Director questioned Ricker with the purpose of establishing Ricker's innocence. In contrast, Anderson and

---

**2.** Both Plaintiffs are African American and Anderson is of Jamaican national origin. Therefore, each has met the first element.

**3.** His temporary replacement is Hispanic.

Raines were interviewed only after numerous employees had been questioned about them, and only by the Director's subordinate. They were explicitly not told what the allegations against them were, or by whom they were made. Anderson and Raines argue that this different treatment is sufficient to show that others, similarly situated, were treated more favorably than they.

It is apparent that the investigation reports do not reveal any great infractions by Ricker.[4] However, the allegedly discriminatory institution, the College, was the creator of the investigation reports. Plaintiffs aver in their affidavits that it would have been impossible for Ricker not to have been aware of the work Anderson did at the College. Other employees, including Nora Nelle, an investigator, testified that all of Anderson's work was done openly in the Maintenance shop, where Ricker would have seen it. Both Plaintiffs testified in their depositions that Ricker used College materials and time to have employees build a porch for his home, as well as other personal projects, like ventilating a crawl space and modifying furniture.

Further, Ricker participated in and was kept apprised of the progress of the investigation even after he was implicated in wrongdoing. Indeed, Nora Nelle testified that she thought it was inappropriate for Ricker to sit in on investigation meetings because it was possible that he was also guilty of wrongdoing. Richard Wynn testified that although he was concerned about how many people in the chain of command were aware of or participated in wrongdoing, he never questioned or investigated whether Ricker was aware of Anderson and Raines's activities. This was despite the fact that Raines maintained throughout the investigation that Ricker was fully aware of all their activities.

We find that taking Plaintiffs' allegations as true, as we must, Plaintiffs have demonstrated that their position was substantially similar to Ricker's, yet he was more favorably treated because of his race. Accordingly, we find that Plaintiffs have made a prima facie case under Title VII.

### REBUTTAL CASE

■ Because Plaintiffs have made a prima facie case, the burden of production switches to the Defendant to assert legitimate, non-discriminatory reasons for the terminations. *Metal Serv.*, 892 F.2d at 347. Plaintiffs do not dispute that the College has met this burden. The College gives three reasons for terminating Anderson and Raines. First, that they performed personal work on College time. Second, that they abused their authority by requiring their employees to do their personal work on College time.[5] Third, that they violated the College's trust by engaging in the above activity.

■ As a result of Defendant's showing, the burden of production returns to Plaintiffs to show that the College's reasons are merely a pretext for discrimination. This is a difficult burden to carry. *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir.1994). At the summary judgment stage, though, Plaintiffs can meet it by producing evidence that either makes us disbelieve Defendant's proffered reasons or that indicates that discrimination was more likely than not a motivating or determinative cause of the termination, possibly by showing such inconsistencies, implausibilities and inconsistencies that make the proffered reasons unbelievable. A plaintiff "need not prove at th[e summary judgment] stage that the employer's purported reasons for its actions was false, but the plaintiff must criticize it effectively enough so as to raise a doubt as to whether it was the true reason for the

---

4. Ricker informed the investigators that once he requested an 8″ piece of dowel to be cut to fit into the hole of a hobby horse for its handle. The employee who did the work testified that he was able to do this work on his lunch hour. He explained that Ricker "is very pointed when it comes to College work and he is very stern that nothing stops the operation of the College."

Ricker also stated that in 1985 he requested an employee to cut some lumber he had brought from home. He stated that the employee cut the wood and then, without being asked, assembled it into a work bench. The worker was no longer employed by the College, so this explanation is uncorroborated.

5. For the purposes of this Motion, we accept Anderson's allegation as true that this reason was not given at the time of his termination, and therefore, do not consider it.

action." *Solt v. Alpo Petfoods, Inc.,* 837 F.Supp. 681, 684 (E.D.Pa.1993) (citing *Naas v. Westinghouse Elec. Corp.,* 818 F.Supp. 874, 877 (W.D.Pa.1993)). The Third Circuit has held that "factors such as the defendant's credibility, the timing of an employee's dismissal, and the employer's treatment of the employee could raise an inference of pretext which would make summary judgment for the employer inappropriate." *Josey,* 996 F.2d at 638–39.

For example, in *Josey,* the African American plaintiff showed numerous inconsistencies that cast doubt on the employer's proffered reasons. For example, the defendant cited economic considerations to explain plaintiff's termination. However, it soon hired a Caucasian employee at a higher wage to fill the plaintiff's old position. 996 F.2d at 640. The Third Circuit held that this inconsistency made it disbelieve the defendant's proffered legitimate reason. *Id.*

Likewise, summary judgment was inappropriate when an African American plaintiff showed that Caucasian employees were not required to submit medical records for absences or return travel advances in cash, yet he was. The Third Circuit held that this disparate employer treatment helped make a showing of pretext. *Weldon,* 896 F.2d at 799.

In contrast, in *Billups v. Methodist Hosp.,* 922 F.2d 1300, 1305 (7th Cir.1991), the Seventh Circuit granted summary judgment in favor of the defendant, a hospital. There, the plaintiff, a nurse, was accused by a coworker of abusing an elderly patient. The hospital conducted an investigation and terminated the nurse based on its results. Plaintiff argued that because she had denied the allegations of abuse and because the investigation was arguably deficient that she had rebutted the employer's legitimate reasons.

The Court held that there were corroborating facts to support the allegations and that "an ill-informed decision or an ill-considered decision is not automatically pretextual if the employer gave an honest explanation for termination." *Id.* at 1304. "More impor-

tantly," the Court held, "plaintiff offered no evidence that would allow a reasonable jury to be able to rule that [plaintiff] demonstrated by a preponderance of the evidence that she would not have been fired 'but for' her race."[6] *Id.* at 1304 (citing *Heerdink v. Amoco Oil,* 919 F.2d 1256, 1261–62 (7th Cir. 1990)).

Here, Plaintiffs offer a number of arguments that they assert demonstrate that the College's proffered reasons are pretextual. Largely, these arguments are the same as their similarly situated arguments. First, Plaintiffs argue that Ricker was treated better than they were in that he was warned of the specific nature of the accusations against him before being questioned and they were not. He was also granted an interview with the actual decision-maker and they were not.

Second, Plaintiffs argue that Ricker was held to a different standard than they were because it was undisputed that Ricker had also hired College employees and used College materials and employee time for his personal benefit.

Third, Sam Williams, an African American employee, had reported concerns about the Physical Plant Department to Richard Wynn a year before Crosson did. Williams, however, was unwilling to name the people involved or be identified as the source of allegations. Wynn discussed Williams' allegations with Ricker, who said that without names or other specific information, any investigation he could undertake would be hampered. Anderson and Raines argue that this incident demonstrates that the issue of misuse of College funds was not important enough to the College to warrant an investigation when it was raised by an African American employee against unknown people, and only became important when a Caucasian worker accused two African American employees.

These arguments are sufficient for this Court to send the matter to the jury. We find that Plaintiffs have provided enough evidence to indicate that the College ignored or discounted allegations of impropriety made against a Caucasian employee, but acted on

---

**6.** We note that use of the term "but for" in this context does not mean that discrimination must be the sole factor in the defendant's decision to not hire or to fire.

748

those made against African American employees. This is enough to make us doubt the College's proffered reasons for their termination. Although the College apparently had ample evidence of massive theft from the College that personally benefitted Anderson and was actively furthered by Raines, it also had at least some evidence that similarly implicated Ricker. Because we find a genuine issue as to a material fact and find that a reasonable jury could find that there is evidence to overcome the College's proffered legitimate reasons, summary judgment is hereby DENIED.